## Mayfield Lumber Co. v. Lewis' Admr.

### (Decided March 14, 1911.)

### Appeal from Graves Circuit Court.

1. **Master and Servant—Personal Injuries—Unsafe Horse.**—If the servant is injured by the vicious conduct of an unsafe and dangerous horse owned by the master, the master will be liable in damages if he knew, or in the exercise of ordinary care, could have known the qualities of the horse, and the servant was not guilty of such contributory negligence as would defeat a recovery.

2.  Evidence of Habits of Horse.—In such a case it is competent to show the bad habits of the horse both before and after the injury complained of; and the reputation of the horse is also admissible as evidence.

ROBBINS & THOMAS, W. J. WEBB and FRED FORCHT, JR., for appellant.

CROSSLAND & CROSSLAND and HENDRICK & CORBETT for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

Running through the plant of the Mayfield Lumber Company there is a passway about twenty-five feet wide, used for the purpose of hauling lumber and material to and from the plant. On one side of this passway is the lumber yard, and on the other side is the building in which the saws, planers and other machinery are located. Opening into this passway from the building there are two separate doors, each about ten feet wide. Back in the building, and about nine feet from one of these doors and immediately in front of it, there was a band-saw. In October, 1907, H. J. Lewis was operating this band-saw in the usual way and standing with his back to the door. The yard foreman, Alexander, directed Robertson, a colored driver of the company, to take a load of lumber in a one-horse wagon from the lumber yard to the planer. Robertson, after getting the load of lumber on the wagon, drove down to the door opposite the band-saw and backed the hind wheels of the wagon to the door, leaving the wagon and the horse standing in the passway. After he had done this, he proceeded to unload the lumber from the wagon by carrying it to the band-saw, which was some distance away. While engaged in this service, a man named Sweeney, who had come to the lumber yard in a one-horse wagon after a load of lumber, was driving in the passway out to the street. When his horse and wagon came opposite the lumber company's horse, the latter became suddenly frightened without cause so far as the record shows and backed the wagon into the building, with the result that the coupling pole struck Lewis in the back, throwing him against the band-saw, causing him to be cut in such a manner as that he died shortly afterwards. To recover damages for his death, this suit was brought. There have been five jury trials. On the first, third and fourth trials, the jury disagreed. On

the second a verdict was returned in favor of the lumber company, but a new trial was granted. On the fifth and last trial the jury returned a verdict in favor of the appellee for $3,000, and this appeal is prosecuted from the judgment on that verdict.

A reversal is asked for alleged error in the admission of evidence, in giving and refusing instructions, and because counsel for the appellee was guilty of misconduct in the argument of the case.

The evidence introduced by both parties took a wide range. Much of it was irrelevant and threw no light on the controversy. The only real substantial issues in the case were, whether the horse was safe or dangerous, the driver competent or careless, and did the company know the character of the horse and the qualifications of the driver. The elucidation of these issues was the end sought to be attained in the introduction of all the evidence. The testimony on behalf of the appellee tended to show that the horse attached to the wagon that backed against the deceased was wild, vicious and dangerous, and that his bad habits and character were known to the company; that the driver was negligent and incompetent, and this was also known to the company. While the evidence on behalf of the company tended to show that the horse was reasonably safe and gentle, and the driver reasonably careful and prudent.

The place where Lewis was working was safe, and he was not guilty of any contributory neglect or any act or conduct that would excuse the company from negligence in having a dangerous horse and an incompetent driver. At the time of his injury Lewis was busily engaged with his work at the band-saw. It does not appear that he knew that the wagon had been backed to the door, or what the driver was doing. There was no reason why he should have given any attention to the movements of either the driver, horse or wagon.

The court in a series of instructions told the jury that it was the duty of the company to furnish the deceased a reasonably safe place in which to work, and reasonably safe appliances with which to work, and to use ordinary care to select and keep in its service reasonably competent and careful employes, and to use ordinary care to select and keep in its service a reasonably gentle and safe horse. They were also told that the deceased when he entered the employment of the company assumed the

ordinary risk incident to his employment, and that if he knew of the unsafe or dangerous qualities of the horse, or by the exercise of ordinary care could have known them, or by the use of ordinary care could have known the place of his work was unsafe, and that the absence of care on his part with reference to the horse or the place of his labor brought about his injury, or death, they should find for the defendant. Although the instructions presented to the jury the real issues in the case, they were more elaborately written than necessary, but we do not think that upon the whole they were prejudicial to the rights of the appellant.

The appellant asked the court to instruct the jury in substance that if the deceased was familiar with the location of the machine at which he was killed, and with the method of delivering lumber into the building where he was working, and was familiar with the habits of the horse in question, and the driver thereof, and continued to work at said place without complaint of any defect or incompetency in the horse, driver or place, they should find for the defendant. This instruction was properly refused, because the knowledge the deceased had of the incompetency or qualities of the horse or driver did not excuse the company, as he had no part in placing the horse or wagon where it was when the horse became frightened, and, as before stated, did not know they would be or were there.

The court also refused to give an instruction telling the jury in substance that if the horse was caused to back by some one driving near him in such a manner as to cause a reasonably gentle and safe horse to move backward, the jury should find for the defendant. There was no evidence to support this instruction. Neither the horse nor the wagon that was driven by Sweeney touched or came in contact with the company horse, nor did anything occur while the wagon was being driven by that would have caused a reasonably safe or gentle horse to back, or otherwise move his position.

It is further insisted that the court erred in allowing evidence to prove the bad conduct of the horse after the accident. We think this evidence competent. In Kennon v. Gilmer, 131 U. S., 22, 33 L. Ed., 110, Kennon brought an action against Gilmer to recover damages for personal injuries upon the ground that Gilmer failed to furnish a competent driver and safe horses for a vehicle

in which he was riding. Upon the trial, evidence was introduced to show the bad habits of the horse, both before and after the injury. In speaking of the admissibility of this evidence, the court said:

"The only objection to the admission of evidence, relied on in argument, is that the plaintiff, who introduced evidence tending to support the allegations of his complaint, as well as evidence that one of the leading horses in the defendant's coach had been fractious and vicious on former occasions, was permitted to introduce evidence that in March, 1881, twenty months after the accident this horse, when being driven in a buggy, kicked and broke the pole and tried to run away. But, evidence of subsequent misbehavior of the horse might properly be admitted, in connection with evidence of his misbehavior at and before the time of the accident, as tending to prove a vicious disposition and fixed habit, and to support the plaintiff's allegation that the horse was not safe and well broken. The length of time afterwards to which such evidence may extend is largely within the discretion of the judge presiding at the trial. * * * The objection to the evidence relating to the habits of the horse subsequent to the time of the accident goes to its weight rather than to its competency. The habit of an animal is in its nature a continuous fact, to be shown by proof of successive acts of a similar kind. Evidence having been first offered to show that the horse had been restive and unmanageable previous to the occasion in question, testimony that he subsequently manifested a similar disposition was competent to prove that his previous conduct was not accidental or unusual, but frequent, and the result of a fixed habit at the time of the accident."

It is also complained that the trial court permitted witnesses to express their opinion that the driver was negligent and incompetent and the horse wild and dangerous. It was competent to prove the bad reputation of the horse and his specific acts of misconduct, and to show that the driver was negligent and incompetent; but, it was not proper to allow witnesses to express their opinion upon these points. The question being considered was not of a character that called for expert evidence. But, we do not think the admission of this opinion evidence was prejudicial. The jury had before them the evidence of the incompetency of the driver and the

bad habits of the horse, and upon this evidence could and doubtless did form their own opinion as to whether the horse was safe or dangerous, or the driver careful or competent. It is not at all probable or reasonable to assume that they were influenced by the fact that some witnesses were allowed to express their opinion upon this subject.

We have read the argument of counsel complained of, and do not find it objectionable.

Nor are we disposed to disturb the ruling of the lower court in granting a new trial, on the occasion when a verdict was returned in favor of the appellant.

After a careful consideration of the entire record, we are convinced that no substantial error to the prejudice of the appellant was committed.

Wherefore, the judgment of the lower court is affirmed.